## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNN REBAR, | : | |
| Plaintiff, | : | CIVIL ACTION No.:  25-204 |
| | : | |
| v. | : | |
| | : | |
| THE GEO GROUP, INC., | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

## COMPLAINT

1.    Ms. Lynn Rebar (hereinafter referred to as "Plaintiff"), through her undersigned counsel and for her complaints against Geo Group (hereinafter referred to as "Defendant"), hereby state the following.

## INTRODUCTION

2.     This action is pursuant to 29 C.F.R. § 1614.407(d), for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* and*,* the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §955 as a result of Defendant subjecting Plaintiff to gender discrimination, sexual harassment/hostile work environment, and retaliation on account of her protected activity.

## JURISDICTION AND VENUE

3.    This Court may exercise original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. §2000e, *et seq.*, as amended by the Civil Rights Act of 1991, the Civil Rights Act of 1866, 42 U.S.C.

§2000e-5(f); and Title VII of the Civil Rights Act of 1964 ("Title VII'), as amended by the Equal Employment Opportunity Act of 1972. Jurisdiction over the PHRA claim is predicated upon 43 P.S. §962.

4.     This Court has supplemental jurisdiction over the claims brought under the PHRA pursuant to 28 U.S.C. § 1367(a), in that the action includes state law claims that are part of the same case or controversy as the federal claim.

## PARTIES

5.     Plaintiff, Ms. Lynn Rebar, is a female individual and currently resident of Pennsylvania, residing at 300 Lingle Street, Osceola Mills, Pennsylvania 16666.

6.     The GEO Group, Inc. ("Defendant"), a Florida corporation that owns, leases, and manages correctional, processing, detention, and re-entry facilities located throughout the United States, including Pennsylvania.

7.     Defendant owns, leases, manages and/or privately operates Moshannon Valley Processing Center ("MVPC") located in Philipsburg, Pennsylvania.

8.     Defendant maintains a principal place of business located at 555 Geo Drive, Philipsburg, Pennsylvania.

9.     Defendant is an "employer" within the meaning of 42 U.S.C. §2000e-(b); and employs well in excess of the threshold number of persons required to be an "employer" subject to federal civil rights and equal employment opportunity laws.

10.    Plaintiff is an "employee" as that term is defined under Title VII, 42 §2000e et seq., during all material times to this action.

11.    At all times relevant hereto, Defendant was acting through its agents, servants and employees, who were acting within the scope of their authority, course of employment, and under the direct control of the Defendant.

12.    Plaintiff has complied with all jurisdictional prerequisites, including those set forth in 42 U.S.C. Section 2000e-5(f), and has exhausted all required state and federal administrative remedies, including proceeding before the United States Equal Employment Opportunity Commission, with dual-filing in the Pennsylvania Human Relations Commission.

## STATEMENT OF FACTS

13.    On October 18, 2021, Defendant hired Plaintiff as Resident Advisor and Security. During all times relevant to this Complaint, Plaintiff successfully performed her job duties to the satisfaction of Defendant.

14.    In Fall 2022, Nurse Lopez was verbally attacked while distributing medication in Unit B. Despite writing a report, she was ignored, and no action was taken.

15.    Between Fall 2022 through present, Geo Group supervisors consistently failed and refused to take corrective action when detainees verbally attacked Plaintiff and other female staff members. This occurred nearly every day, several times a day, where detainees got angry, they would frequently direct slurs like "bitch" and "puta"

(the Spanish equivalent for "whore" or "bitch") at the female staff, often right after speaking with them. Despite the Plaintiff repeatedly complaining about this behavior, Plaintiff's complaints went unaddressed.

16.    Between Fall 2022 through present, Defendant intentionally designated Unit E and Unit D-6 as exclusively female units, despite both lacking any restroom facilities. In stark contrast, male colleagues assigned to other units had readily available restroom access within their assigned areas.

17.    Between Fall 2022 through present, Defendant constantly changed the restroom policy. In practice, Plaintiff was expected to call over the radio for a restroom break and wait for someone to show up. However, there were many times when no one would ever show up to relieve her from her post. This was a practice male colleagues were never subject to and/or never observed.

18.    In Fall 2022, Plaintiff was required to pat down transgender male detainee who were not on hormone therapy and who made sexually suggestive comments such as "oh baby, that feels good" and "I am so happy that it's you; this makes my day." Despite complaints and witnesses to this conduct, Defendant took no remedial action.

19.    Between on or around December 18, 2023 through present, and continuing, Geo Group supervisors Lieutenant Vanessa Mignot, who had just been promoted from a Housing Unit Supervisor to a Lieutenant position in December 2023,

(hereinafter "Lt. Mignot"), and Lieutenant Arleen Ketrow (hereinafter "Lt. Ketrow") required Complainant to call for relief to use the restroom where male employees did not have to call for relief and, as a result, delayed her ability to use the restroom, wrote her up for using a cell restroom, and made her and other female employees go to a different building on the compound to use the restroom.

20.     Between January 2024 through present, Lt. Mignot and Assistant Facility Administrator Michael Bollinger (hereinafter "AFA Bollinger") verbally counseled Complainant and issued her written reprimands.

21.     From January 19 to July 18, 2023, a white female staff member was repeatedly accused of inappropriate behavior with detainees, subjected to strip searches, and removed from the mainline without cause. Plaintiff would hear this exchange on the radio. Despite the staff member referring to video footage, memos and support, she was harassed out of her role and demoted to another position due to the poor treatment.

22.     In Spring 2023, a detainee physically assaulted Plaintiff by grabbing her around the waist, hooking his arm around her, and asking, "Can you handle this?" – making sexual innuendo. The bubble officer, or "OCI" (Officer in Charge), who controls all access to and from the unit's doors and is the sole individual with such access, was on duty but failed to intervene during the incident. Following the assault, Plaintiff was questioned about her response time.

23.    On March 18, 2023, while the Plaintiff was in the restroom, a detainee was intentionally let inside by a bubble officer, who opened the door after the detainee claimed he was helping the Plaintiff dispose of trash. The detainee then entered the Plaintiff's stall while she was on the toilet and attempted to rape her. The Plaintiff immediately fought back, defending herself by throwing toilet paper at him. Following this traumatic event, instead of being offered support or asked about her well-being, the Plaintiff was blamed for not locking the door, despite the urgent nature of her restroom use and the fact that the bubble officer was directly responsible for allowing the detainee access.

24.    Plaintiff filed an incident report regarding the attempted rape but Captain Gilbert, Plaintiff's superior, later stated that his "higher ups" demanded the Plaintiff's incident report be changed and he failed to attach crucial evidence to the corporate complaint. When the Plaintiff subsequently requested a copy of the revised report, it was never provided.

25.    On July 26, 2023, Plaintiff called for relief to use the restroom but received no response and was forced to urinate in a janitor's closet.

26.    Also, On July 26, 2023, at approximately 10:00 a.m., Plaintiff again called for the restroom relief but was not relieved. This contributed to Plaintiff's significant adverse health effects.

27.    On October 5, 2023, Plaintiff called three staff members for restroom relief, but no one came. As a result, she was forced to urinate in a mop sink.

28.    On January 9, 2024, at 7:15 a.m., Plaintiff informed Lts. Ketrow and Mignot of severe gastrointestinal distress and the inability to go without any restroom access. Plaintiff was not reassigned, and she had to use a cell bathroom. After calling off work the next day, Plaintiff was given a verbal reprimand on January 11, 2024, by Lts. Mignot and Lt. Pattison for using the cell restroom.

29.    On January 11, 2024, Lt. Mignot and Lt. Pattison, along with union representative Long, verbally reprimanded Plaintiff for using a cell bathroom, claiming it violated policy.

30.    On January 12, 2024, at 10:15 a.m., Plaintiff was told she was not allowed to use the Special Housing Unit ("SHU") bathroom.

31.    On January 12, 2024, Plaintiff called multiple locations for restroom relief but didn't receive an answer.

32.    On January 16, 2024, Plaintiff was mandated to work a 16-hour shift in Unit E, a post without a restroom, a burden faced exclusively by female security personnel, as their male counterparts were not subjected to such significant restroom availability issues. The request for reassignment was ignored.

33.    On January 16, 2024, at 2:20 p.m., Plaintiff again called for restroom relief and was told no one was available. Lt. Pattison was visibly present but refused to help.

34.    On January 23, 2024, Lt. V. Mignot questioned detainees about Plaintiff's work ethic.

35.    On January 24, 2024, at 9:30 a.m., Plaintiff, out of extreme urgency, used the SHU restroom.

36.    On January 25, 2024, Lt. Mignot told Plaintiff not to contact her for restroom relief, even when in her unit, and instead advised her to contact the Captain M. Hampton or compound Lieutenant Trey English.

37.    Later, January 25, 2024, at 10:15 a.m., Lt. Mignot reiterated the instruction that only the compound Captain or Lieutenant could be called for restroom breaks. When Plaintiff questioned about using the SHU restroom, Lt. Mignot said it was forbidden per Chief Lytle.

38.    Between January 23-25, 2024, Lt. Mignot questioned multiple detainees about whether Plaintiff was completing her job duties, continuing the pattern of harassment/retaliation.

39.    On February 1, 2024, at 8:29 a.m., Plaintiff asked Dr. Cressley, a physiatrist working for the detention center, if she could use the restroom while waiting on

residents, and permission was granted. However, Lt. Pattison later said Plaintiff could not use the restroom when anyone other than security was present.

40.    On February 2, 2024, Plaintiff was called into the Chief Lytle's office regarding the complaint filed against Lt. Mignot. The Chief Lytle stated that Lt. Mignot received a verbal reprimand and then reiterated that only security personnel could provide restroom breaks.

41.    On February 3, 2024, Plaintiff had to wait 10 minutes for restroom relief and had to walk to another building. Additionally, Plaintiff was unable to hydrate for the rest of her shift due to not having restroom relief.

42.    Later, February 3, 2024, Plaintiff waited 22 minutes for restroom relief, again Plaintiff was unable to hydrate due to not having restroom relief.

43.    Also, on February 3, 2024, at 8:19 a.m., Plaintiff called visitation for a restroom break. After several minutes, relief arrived, and upon return, she learned from Knepp, another supervisor in charge of the unit, that Facility Administrator Leonard Oddo, FA Oddo, said anyone could relieve for a restroom break. Plaintiff informed Knepp that Chief Lytle only allows for security to relieve restroom breaks.

44.    Due to the agency's discriminatory policies and treatment, the Plaintiff suffered injuries. Plaintiff sought medical attention on February 6, 2024.

45.    On February 6, 2024, at 11:13 a.m., after Plaintiff complained and reached out to her colleagues, Chief Lytle confirmed that anyone could provide restroom relief.

46.    On February 7, 2024, Plaintiff developed a urinary tract infection, which was attributed to the ongoing denial of restroom relief and poor treatment.

47.    On February 10, 2024, Plaintiff experienced a 20-minute delay in restroom relief after requesting it.

48.    Later, on February 10, 2024, at 10:19 a.m., Plaintiff called Lt. Pattison for restroom relief. Plaintiff was told to "stand by" and waited until 10:40 a.m. before being relieved.

49.    On February 15, 2024, Plaintiff followed an established policy for completing a task, but Lt. Mignot rejected the method, stating that she had personally selected the Plaintiff for the task. Additionally, on February 16, 2024, Lt. Mignot and Captain J. Kopchick verbally reprimanded Plaintiff for not completing a task, even though it had already been finished.

50.    On April 30, 2024, Plaintiff was not scheduled in Unit E but was sent there anyway. The unit lacked a restroom, adding to the ongoing hostile and discriminatory work environment.

51.    On May 6, 2024, Plaintiff was again assigned to Unit E despite not being in post there. Lt. Mignot referred to her as "hon" or "honey," which contributed to the hostile environment.

52.    On May 7, 2024, despite the Plaintiff's explicit requests and reports that she did not want to work in Unit E due to its lack of a restroom, she was once again

assigned there. This assignment further perpetuated the hostile and discriminatory work conditions that disproportionately affected only female security personnel, as male staff did not face similar restroom access issues.

53.    On May 13, 2024, Plaintiff felt stressed and anxious working under the supervision of Lt. Mignot, who she feared wanted her fired. Additionally, the post did not have restrooms.

54.    On May 16, 2024, while the Plaintiff was posted in B Control, Lt. Mignot would intentionally approach her to ask for bed cards. These "bed cards" are a critical record-keeping tool, a book that precisely clarifies each detainee's assigned location and bunk within the facility. Lt. Mignot would then use these interactions to intimidate the Plaintiff, frequently asserting that she was incorrect in her understanding of the assigned beds. This behavior created a hostile environment by constantly questioning the Plaintiff's competence and accuracy in her duties.

55.    On May 21, 2024, Plaintiff was not scheduled for Unit E, yet she was placed there again. Repeatedly placing Plaintiff in a unit with no bathrooms caused Plaintiff ongoing stress and anxiety.

56.    On May 22, 2024, the Plaintiff was listed to work in Unit E and voiced her concerns to Union Representative M. Ternaway. He then contacted the Captain and Lieutenant, reiterating that the Plaintiff had previously bid out of Unit E due to

harassment by Lt. Mignot. The harassment and working conditions were so significant in Unit E by Lt. Mignot that Plaintiff was forced to bid out of that unit.

57.    On May 23, 2024, Lt. Mignot searched Plaintiff before she entered the compound. During the search, she squeezed under Plaintiff's breasts and up into her crotch area. This incident has happened to other women. Plaintiff reported the sexual harassment to Supervisor C. Minarchick.

58.    On June 6, 2024, Plaintiff was pulled into a meeting with Warden, HR, and supervisors, including P. Sayers, Union Chief, and C. Proud. In this meeting, Defendant denied the Plaintiff access to union representation, an action unprecedented for any employee.

59.    Also, on June 6, 2024, Plaintiff was written up by AFA Bollinger for allegedly not signing cord paperwork in Unit E. However, Plaintiff checked the logbook and proved she was not on post that day. Despite this, Plaintiff was disciplined again.

60.    Additionally, on June 6, 2024, Plaintiff was called into Chief Lytle's office and written up by AFA Bollinger based on information from Lt. Mignot, even though Plaintiff proved she was not on post on the date in question. Plaintiff was denied a copy of the written memorandum and denied Union Representation during the meeting.

61.    On June 10, 2024, Plaintiff and Zimmerman, a female coworker, were talking about Unit E when Lt. Mignot suddenly approached them and interrogated them about a cord issue.

62.    On June 17, 2024, Plaintiff again had no restroom access during her shift.

63.    On June 19, 2024, Plaintiff was called off her post to conduct a pat search on a female in visitation. When Plaintiff arrived, Lt. Mignot stated, "what are you doing here? I can handle it. You are not needed. I don't know who called you."

64.    Also, on June 19, 2024, Plaintiff was sexually assaulted when a detainee stroked her head and grazed her breast. Despite Plaintiff reporting the incident and writing him up, the Defendant failed to provide a proper remedy to prevent recurrence. The detainee was briefly placed in the SHU, Special Housing Unit, for only five to ten days before being returned to the very same male unit, leaving Plaintiff vulnerable.

65.    In June 2024, Plaintiff reported numerous incidents of catcalling, whistling, and kissing noises from inmates.

66.    On June 21, 2024, L. McCartney, Plaintiff's coworker, told Plaintiff that Lt. Mignot coached L. McCartney to put in a memo that Plaintiff was writing memos against Lt. Mignot. Plaintiff believes this behavior by Lt. Mignot was to deflect attention from the targeting and harassment against Plaintiff.

67.    On June 24, 2024, Lt. Mignot confronted Plaintiff and threatened disciplinary action because Plaintiff had given detainees more than one brown paper towel.

68.    Also on June 24, 2024, Plaintiff spoke with HR representative J. Hughes about the bullying, lack of restrooms, and being denied union representation.

69.    On or around June 2024, all women were relocated from Unit E to Delta 6, a new building that lacked a restroom. During an annual training, FA Oddo and AFA Bollinger stated that installing a restroom in the women's unit was "not in the plans".

70.    On July 9, 2024, a nurse told Plaintiff that medical staff could not provide restroom relief. Plaintiff called the Warden, who clarified that anyone could provide relief. However, Captain Glass contradicted this and said only security could relieve staff.

71.    On July 11, 2024, Lt. Mignot told Plaintiff not to "go over her head," in direct response to Plaintiff's previous complaints.

72.    Also on July 11, 2024, Plaintiff went to the restroom, and upon returning, Lt. Mignot interrogated her about where she had relieved herself. She then claimed Plaintiff had not followed the directive to use medical facilities.

73.    On July 17, 2024, a memo from staff member Gisewhite indicated that Lt. Mignot made a comment, referring to Plaintiff's boyfriend, an African American, as an ex- detainee at MVPC.

74.    On July 16, 2024, RA L. Sanders submitted her two-week notice due to harassment, sexual discrimination, and hostile environment. The following day, she submitted a memo stating she was also harassed by Lt. Mignot.

75.    On July 19, 2024, Plaintiff was going through paperwork when Lt. Mignot grabbed the documents and accused her of being disrespectful. Lt. Mignot also referenced the memos Plaintiff had filed.

76.    On July 23, 2024, Lt. Mignot gave Plaintiff verbal approval to retrieve a food tray for a detainee, claiming FA Oddo had also approved. However, AFA Bollinger later contradicted this approval and stated there must be medical clearances.

77.    On July 23, 2024 and July 25, 2024, there was a sewage backup in the pod and again no restroom access.

78.    On July 25, 2024, Plaintiff informed Lt. Mignot she needed to use the restroom, but she blocked the door. As a result of Lt. Mignot's actions and despite her repeated requests for relief, the Plaintiff involuntarily had a bowel movement in her pants. Deeply upset, she reported the incident to Captain L. George. The circumstances of the incident necessitated Plaintiff being sent home.

79.    Also on July 25, 2024, Plaintiff called Union Rep M. Ternaway, who said he overheard AFA Bollinger say "just got rid of one, one more to go," referring to Plaintiff and a previously terminated employee. Plaintiff had previously filed a complaint naming AFA Bollinger.

80.    On July 29, 2024, after filing harassment complaints, the Plaintiff was assigned to D-6 with Lt. Mignot, a unit without restroom access. A lock on the second gate prevented her entry, as her key didn't work, necessitating a locksmith. This lock was unique to the women's unit, as gates outside C and D had no locks.

81.    Also on July 29, 2024, Plaintiff asked detainees to write memos about an incident with Lt. Mignot, who denied her restroom access.

82.    On July 30, 2024, in the D-6 female unit with no restrooms, Plaintiff called for a cart that would help her push objects. She could not respond to Lt. Mignot's radio due to high noise levels, leading Lt. Mignot to question why she ignored her call.

83.    Also on July 30, 2024, another female coworker, Sarrara, quit. This marked the third woman to quit within two weeks due to a hostile work environment and sexual discrimination.

84.    On July 31, 2024, while attempting to use the restroom in post D-6, the Plaintiff had to call multiple locations for relief. Lieutenant English arrived but lacked the correct keys for the newly installed lock. This new lock on the gate also prevented the Plaintiff from handing off her own keys, leaving her stuck until a rover with the right key arrived. The Plaintiff was also unable to enter or exit to get access to the restroom, as it was in another building. While the Plaintiff was in the restroom, Lt. Mignot radioed her, forcing the Plaintiff to explain why she was locked in. The

Plaintiff specifically highlighted the safety concerns of being unable to enter or exit the restroom.

85.    On July 31, 2024, Union Rep M. Ternaway told the Plaintiff in the parking lot that E. Kuhstos, Human Resources Representative, thought she was responsible for another OSHA complaint, leading the Plaintiff to feel targeted.

86.    In July 2024, coworker H. Ceret submitted a complaint to OSHA and Corporate regarding lack of bathroom access, sewage backup, and safety hazards.

87.    On August 1, 2024, Plaintiff worked under Lt. Mignot in D-6 without access to a restroom.

88.    Also on August 1, 2024, Chief Lytle issued an email detailing a new restroom relief protocol for D-6. The new procedure involved exchanging keys through a locked gate with relief staff and then making a call to have the gate unlocked once finished. A significant concern with this protocol is the potential for issues during a power outage.

89.    On August 1, 2024, a coworker approached the Plaintiff and asked if she was "bringing anything in" for the detainees, implying she was smuggling contraband. The Plaintiff clarified that she only brought permitted items in her clear bag, which she did every day. The coworker then informed her that "they", meaning Lt. Mignot, were claiming that the Plaintiff was bringing in items for detainees. In response, the

Plaintiff submitted a memo to Chief Lytle and the Union Representative to complain about this issue.

90.    On August 1, 2024, the Plaintiff expressed her distress to B. Brown, a caseworker, stating that certain women had been allowed to decline D-6 assignments because of the absence of restroom facilities. She noted that abandoning one's post was grounds for potential termination.

91.    On August 6, 2024, there was a sewage backup in the pod, which left no access to the restroom in D-6.

92.    On August 6, 2024, Lt. Mignot informed Plaintiff that Pam Stauffer, who manages detainee payroll, reported not receiving work papers. Plaintiff, however, personally delivers these reports every day. When Plaintiff contacted Stauffer, she clarified that the issue had occurred on Sunday, Plaintiff's day off.

93.    On August 7, 2024, once more, Plaintiff was forced to work without restroom access. She also inquired why her bid, submitted on July 5th, well before the July 11th deadline, had been rejected. However, Plaintiff received no explanation.

94.    On August 8, 2024, Plaintiff still had no restroom access and was called to speak with Chief Lytle in the Lieutenant's office with Union Rep., P. Sayer. Plaintiff reported the sewage back up in the pods.

95.    On August 9, 2024, during pouring rain, Plaintiff and another coworker had to walk outside to another building to use the restroom.

96.    On August 10, 2024, Plaintiff called RA Carlson and RA Seymour for restroom relief. Seymore advised her to contact RA Arnold or RA Weakland. Arnold relieved her and she later reported the incident to Captain Glass.

97.    On August 11, 2024, the Plaintiff learned from a detainee that Lt. Mignot was questioning who had made changes in the unit; she had already cleared this with Captain Glass.

98.    On August 12, 2024, Plaintiff again had no restroom access in D-6.

99.    On August 14, 2024, Plaintiff reported another sewage back up and lack of restroom access. Plaintiff wore an N-95 mask due to the smell of the sewage and spoke with Captain Glass, who advised her to run a fan and open a door. Later, Lt. Mignot called over the radio for her to "get back to D-6," after she was briefly talking about human waste with colleague, RA Price.

100.    On August 15, 2024, after the Plaintiff's union meeting, a union representative and coworker informed her that Lt. Mignot had called Plaintiff over the radio 36 times in a shift.

101.    Also, on August 15, 2024, following another sewer backup, coworkers submitted memos asserting that Lt. Mignot was failing at her job and made their day unnecessarily difficult.

102.    On August 16, 2024, despite her expressed concerns, the Plaintiff was assigned to Unit C, a location that housed a detainee who had previously viewed her

private areas. After she contacted Captain Jackson and declined this assignment, she was transferred to Unit B. However, this unit also housed an individual known for sexual harassment. Captain Jackson further informed the Plaintiff that she was prohibited from entering D-6.

103.    Also, on August 16, 2024, after hearing from P. Sayers that Lt. Mignot accused Plaintiff of "getting the women excited," Plaintiff contacted Union Representative M. Ternaway. This was a false statement from Lt. Mignot, especially given Mignot's prior accusation that Plaintiff instructed detainees to flush tampons in the toilet.

104.    On August 16, 2024, Plaintiff made several inquiries with her Union Chief P. Sayers about the status of her grievance but Plaintiff received no response.

105.    On August 21, 2024, Plaintiff entered Unit A to find it in chaos, with detainees disregarding policy. There were significant problems with tents and lines. Despite this, AFA Bollinger and other supervisors failed to take remedial measures in the unit. The Plaintiff had no prior rapport with these detainees and felt unprepared to handle the threats Unit A detainees made towards staff members. She expressed her concerns, and by midday, Lt. Mignot oversaw the unit.

106.    On August 22, 2024, Plaintiff was working in Unit A alongside Lieutenant Mignot when she went to process a detainee for intake. During this period, Union Chief P. Sayers and Chief Lytle were engaged in conversation. Plaintiff noted she still hadn't received any updates on her grievance.

107. On August 27, 2024, Plaintiff was initially scheduled to work in Unit C, a unit housing a detainee who had previously harassed her. She requested to switch posts with B. English and was instead assigned to Unit B, where another known harasser was located. Defendant's "zero tolerance" policy for sexual harassment was not enforced.

108. On August 29, 2024, Plaintiff was mandated for a shift and given two options: Unit C, where a harasser was house, or Unit B, where a different harasser was housed. Both individuals had sexually harassed Plaintiff in the past. Defendant's leadership previously stated that detainees who assault staff would be removed from the facility, this promise was not honored.

109. On August 30, 2024, Plaintiff was again scheduled in Unit B with an individual who had sexually harassed her. She requested a switch from RA Carlson due to safety concerns and emailed Union Chief P. Sayers about repeated assignments to the unsafe units.

110. Also, on August 30, 2024, Plaintiff was posted in Unit B with a detainee who had previously assaulted her. Despite Defendant's zero-tolerance policy, she was exposed to continued harassment and retaliation.

111. On September 3, 2024, Plaintiff was scheduled in Unit C with a detainee who had previously assaulted her. She switched with RA B. English and ended up in Unit

B, again near a known harasser. Despite Defendant's zero-tolerance policy, she was exposed to continued harassment and retaliation.

112.   On September 4, 2024, Plaintiff was again posted in Unit C with a known harasser and switched with B. English to Unit B, with an individual who had sexually harassed her. Despite Defendant's zero-tolerance policy, she was exposed to continued harassment and retaliation.

113.   On September 5, 2024, Plaintiff was again placed in Unit B where she was previously assaulted. Despite Defendant's zero-tolerance policy, she was exposed to continued harassment and retaliation. Additionally, RA McCartney submitted a memo stating she had urinated on herself because no one came to relive her for the restroom. She informed Plaintiff of this occurrence.

114.   On September 6, 2024, Plaintiff was scheduled in Unit B where she was previously assaulted. Despite Defendant's zero-tolerance policy, she was exposed to continued harassment and retaliation.

115.   On September 10, 2024, upon arriving at work, Lt. Mignot greeted Plaintiff by announcing she was assigned to Unit B that day. Despite Defendant's zero-tolerance policy, she was exposed to continued harassment and retaliation.

116.   On September 11, 2024, upon arriving at work, Lt. Mignot made it a point to announce Plaintiff's assignment to D-1, removing her from her original post in D-6 and positioning Plaintiff to work with her.

117.   On September 12, 2024, upon arriving at work, Lt. Mignot once again assigned the Plaintiff to Unit C, a unit housing a known harasser. To avoid this individual, the Plaintiff was forced to switch posts with RA B. English.

118.   On September 13, 2024, during a detainee yard fight, Lt. Mignot radioed the Plaintiff, instructing her to retrieve a wand. After she delivered it, Lt. Mignot questioned her about staffing in the unit. Captain George observed this interaction and stated he would speak with Lt. Mignot about it.

119.   On September 20, 2024, a detainee informed Plaintiff that a coworker of L. Wilson called them "black monkeys." Plaintiff submitted a memo and the resident filed a grievance.

120.   On September 28, 2024, Union Rep. M. Ternaway informed Plaintiff that she was kicked out of her Unit D post to separate her from Lt. Mignot. However, he said "too late" for that. She was then reassigned to the kitchen, a position for which she never bid.

121.   On October 2, 2024, while in Unit A, the Plaintiff was confronted by Lt. Mignot, who was not assigned to that unit. Lt. Mignot called the Plaintiff "Hun," to which the Plaintiff responded by asking her to use only her name and warned that she would file a sexual harassment complaint. Lt. Mignot then claimed Chief Lytle had sent her. The Plaintiff subsequently called Captain George and noted that multiple coworkers witnessed the interaction.

122.   On October 5, 2024, Plaintiff was again posted in Unit C, a unit housing a known harasser. Plaintiff became visibly upset, crying as she told Captain Glass that she did not want to work there.

123.   On October 9, 2024, while in Medical, the Plaintiff witnessed a male detainee masturbating with peanut butter. A captain then instructed a nurse to put up a curtain. Male Resident Assistants (RAs) are not permitted to observe female inmates in such situations, yet female staff are routinely forced to endure these conditions.

124.   Also, on October 9, 2024, Lt. Mignot searched the Plaintiff in the front lobby. Later that day, Lt. Mignot called Medical, demanding information from the Plaintiff about a fight in her unit. This request was made despite Lt. Mignot's presence during the incident and her access to the camera footage and logbook. The Plaintiff, however, was not present during the fight and had no information to provide.

125.   On multiple occasions, Plaintiff emailed Captain Hampton regarding her removal from D-6, her original post and concerns about her shift, but received no response.

126.   On October 24, 2024, Plaintiff was posted in the library, a non-union position. Lt. Mignot approached her and questioned why she was there. Plaintiff explained that the Captain had informed her the librarian would be absent that day. Lt. Mignot returned later and again challenged the Plaintiff's presence, claiming she had been

told the librarian would be in. The Plaintiff reiterated that the librarian was out until Monday.

127.   On October 25, 2024, Plaintiff was sick and contacted Captain George to go home. Despite emailing and calling, no one was sent to relieve her, and she had to remain at work.

128.   During the last week of October 2024, Officer Seymour made inappropriate comments about Plaintiff's breasts while they were in the Unit B bubble. Specifically, he said she had a "nice rack."

129.   During ART training, AFA Bollinger gave a speech stating that "women are the main contributors to contraband and sex with residents." He also acknowledged there was no restroom in the female unit.

130.   On November 6, 2024, Plaintiff was in Unit E with no restroom access and no post orders. When she called RA Meyers for relief, he said, "I'm a dude," and did not assist. Plaintiff had to go to another building to relieve herself. She then noticed a posted sign prohibiting the use of cell restrooms, facilities her coworkers had been using for months.

131.   On November 12, 2024, Plaintiff was again in Unit E with no restroom and still no post orders.

132.   On December 9, 2024, Plaintiff was placed in D-6 after being removed from her bid post. She was told by Union Rep M. Ternaway that some staff believed she

was telling women to flush pads down the toilet. BOP coworkers confirmed the sewer issues had always been a problem.

133.   On December 16, 2024, Plaintiff was awarded the bid for D-6, a unit from which she had previously been removed. She tried to discuss her re-entry into the women's unit but was ignored.

134.   On December 18, 2024, Plaintiff was searched by Lt. Mignot shortly after filing a harassment complaint.

135.   On December 30, 2024, during a recreation move in Unit B, Plaintiff was standing at the back door when C. Young flipped her off after reporting issues to R. Braniff and Lt. Minachick concerning the Plaintiff wearing red nail polish.

136.   On January 7, 2025, Plaintiff was again assigned to D-6, where there was no restroom access.

137.   On January 12, 2025, the Defendant accused Plaintiff of seeking legal counsel from a detainee. This accusation stemmed from a detainee reportedly overhearing the Plaintiff's conversation with a coworker about a personal issue. As a result, there was an OPR, an investigation by the company, to determine her alleged conduct. The Plaintiff views this allegation as retaliation, particularly because other colleagues frequently discuss similar topics and their personal lives with detainees without ever facing similar repercussions.

138.  On January 21, 2025, Plaintiff experienced an unprofessional incident with Captain Ketrow. When she called about a mandate, she was told "if this isn't about work, I do not wish to speak to you." Plaintiff emailed the Union and informed Lt. Minarchick.

139.  On January 28, 2025, in the front lobby, Plaintiff was searched by Lt. S. Knepp. At that time, J. Hughes was searched by Lt. Mignot who laughed loudly and commented, "I hope I didn't violate you."

140.  Also, On January 28, 2025, while pushing lunch carts out of Unit B, C. Young yelled at Plaintiff "the fucking red fingernail polish again, did you miss me."

141.  On February 28, 2025, Plaintiff was removed from her post and was not provided any reason for her removal.

142.  On February 28, 2025, after the Plaintiff was removed from her post, the Plaintiff emailed Chief Lytle to ask why he had been BCC'd on the communication, but she received no response.

143.  Also, On February 28, 2025, during an ART training, AFA Bollinger reportedly stated, "There is a female RA talking about her divorce and that OPR is not going to stop her even if it takes three to four years," alluding to Plaintiff.

144.  On April 17, 2025, AFA Bollinger announced to all staff during an ART training that a particular female employee had "changed her ways, but that she would be back to it soon enough." His remarks again alluded to the Plaintiff.

145.   On April 29, 2025, Plaintiff and N. Eckberg, a white female coworker, were both scheduled to work in Unit D, which is a male unit. This placed two female officers on the floor, with one of them being sent to recreation for two hours. As a result, one female officer was left alone to supervise four pods of male detainees. Contrarily, no male officers are permitted to work in a female unit.

146.   On May 19, 2025, Plaintiff called Lt. Knepp for restroom relief. After not receiving relief, Plaintiff had an accident in her pants, which she disclosed to Lt. Knepp. Plaintiff did not report the incident to anyone else since in the past, Lt. Mignot denied her restroom access and sent her home without pay for a similar incident. In this instance, Plaintiff was sent home by Capt. George.

147.   On May 29th, 2025, Plaintiff was threatened with a write up for not wearing Geo issued pants even though the Lt. Mignot and other staff were not wearing "Geo" pants. Lt. Bumbarger and Blain Seilhamer DO were witnesses.

148.   Between late May and early June 2025, management disregarded Plaintiff's medical documentation which excused her absence(s).

149.   On or around early June 2025, Plaintiff was ignored when requesting to take a day off.

150.   On June 16th, 2025, Plaintiff was prohibited from accessing a work computer to complete work assignments, such as incident reports (IR's) and memos. Plaintiff received a written warning for speaking loudly on the phone about the issue.

151.   On June 17th 2025, Lt. Knepp took the Plaintiff aside to ask what her problem was and Plaintiff advised Lt. Knepp that the bubble officer required Plaintiff to sign for keys, cuffs, and radio that the trainee was using to train when Plaintiff did not have any of those items on her person.  As a result of this interaction, Lt. Knepp threatened to write the Plaintiff up.

152.   On June 25th, 2025, Lt. Knepp screamed at Plaintiff saying, "I have my own shit to do I have to get my own shit done." When the Plaintiff asked to speak with her in private, Lt. Knepp responded "Fuck you."

153.   On June 30th, 2025, while working alone in the female unit, the Plaintiff lost her voice, rendering her unable to verbally call for help. With only a radio for assistance, and no one responding to her calls, she was left in a highly dangerous situation with the other detainees, unable to exit the unit, directly compromising her safety.

154.   On July 2, 2025, Lt. Knepp requested Plaintiff to sign official documents that, by protocol, necessitated the signature of the person currently on shift. The Plaintiff declined this request, explaining how she would not engage in forgery, nor would she want to jeopardize her employment by doing so.

155.   On July 3, 2025, Defendant disciplined Plaintiff, via a Disciplinary Action Form which incorporated disciplinary action on May 29, 2025, which Defendant had previously rescinded.

## COUNT I
### *Title VII - Gender Discrimination*

156.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

157.    Plaintiff is a female and, as such, is a member of a protected class under Title VII of the Civil Rights Act of 1964.

158.    Defendant's actions, as described above, constitute unlawful discrimination against Plaintiff on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.§ 2000e et seq.

159.    Defendant mandated Plaintiff to work various shifts in Unit E, an all-women's unit. This post lacked a restroom, a significant issue Plaintiff raised by requesting reassignment, but her request was ignored. In contrast, the male units had direct access to restrooms within their units.

160.    Defendant failed to provide and/or maintain equal/equitable and/or equitably facilitated/located restroom facilities for its female employees as it did for its male employees.

161.    Plaintiff was also required to adhere to more onerous standards for rest room relief as compared to her male coworkers/colleagues.

162.    Moving all women from Unit E to Delta 6, a newly constructed building that similarly lacked restroom facilities, constituted a discriminatory act by the Defendant, targeting the Plaintiff based on her gender.

163. The Defendant had a consistent practice of denying Plaintiff restroom breaks. Furthermore, the Defendant ignored Plaintiff's inquiries regarding restroom accessibility specifically for women.

164. An agent of the Defendant, AFA Bollinger, acknowledged during a ART training, that "women are the main contributors to contraband and sex with residents." He also acknowledged there was no restroom in the female unit.

165. Defendant did not grant females access to the work computers, a problem only in the female unit.

166. Defendant's unfair treatment to the female staff contributed to disparate treatment based on gender in violation of Title VII.

167. As a result of Defendant's denial of restroom relief and poor treatment, Plaintiff developed a urinary tract infection and was deterred from drinking water worried it may lead Plaintiff to require a restroom break.

168. Plaintiff suffered significant, anxiety, stress, physical and emotional harm due to Defendant's actions and/or inaction.

169. Defendant's discriminatory denial of accessible restroom facilities for female employees, which directly caused Plaintiff to suffer physical and emotional harm, constitutes a hostile work environment and disparate treatment based on gender in violation of Title VII.

170.   As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has been deprived of economic and non-economic benefits, including, but not limited to, wages, mental and emotional distress, pain and suffering, and disruption of her personal life.

**COUNT II**
***Title VII - Sexual Harassment/Hostile Workplace***

171.   The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

172.   Plaintiff was subjected to unwelcome conduct of a sexual nature, including sexually suggestive comments by inmates, witnessing a male detainee masturbate, inappropriate touching and unwelcomed sexually suggestive verbal comments by supervisor Lt. Mignot, coworkers and detainees.

173.   Plaintiff was sexually assaulted by detainees.

174.   The conduct complained of was severe or pervasive enough to alter the conditions of Plaintiff's employment and created an objectively hostile, intimidating, and abusive work environment.

175.   The harassment was based on the Plaintiff's sex.

176.   Defendant knew or should have known of the severe and pervasive sexual harassment and hostile work environment but failed to take prompt and effective remedial action.

177.    Defendant is liable for the harassment caused and/or perpetrated by its agents under the theory of vicarious liability.

178.    Defendant is further liable for the harassment and assaults by detainees due to its deliberate indifference, failure to enforce its own zero tolerance policy, failure to take appropriate disciplinary action against detainees who sexually assaulted other staff members, thereby fostering a hostile environment and/or failure to take prompt remedial action.

179.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has been deprived of economic and non-economic benefits, including, but not limited to, wages, mental pain and suffering, and disruption of her personal life.

## COUNT III
### *Title VII - Retaliation*

180.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

181.    Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964, which included lodging complaints of pervasive sexual harassment in her work environment and raising concerns about not having access to adequate restroom facilities during her work shifts.

182.    Rather than taking remedial and/or corrective action to address Plaintiff's complaints of sexual harassment, Defendant subjected Plaintiff to various adverse

employment actions, including but not limited to, Lt. Mignot's continued use of unwelcomed conduct and questioning detainees about Plaintiff's work ethic numerous times. Additionally, Defendant placed the detainee who sexually assaulted Plaintiff back on the same compound where Plaintiff worked, directly exposing Plaintiff to her assailants. Further, mandating the Plaintiff to choose between being housed in an area or assigned to duties where she would be forced to work alongside two different detainees who had previously sexually harassed her.

183. On a number of occasions, Plaintiff was denied relief to use the restroom by the Defendant. Consequently, Plaintiff would urinate on herself following the delay or denial to take a restroom break.

184. Following Plaintiff's protected activity of complaining of these restroom conditions, Defendant would force Plaintiff to go home without pay after Plaintiff informed Lt. Mignot that she needed to use the restroom.

185. In retaliation for her protected activity, Plaintiff also experienced other adverse actions from Defendant, such as her implication that Plaintiff was supplying contraband to detainees, unwarranted discipline, disparate treatment, routinely yelling at her, and threatening to write Plaintiff up.

186. Defendant's unlawful act of requiring Plaintiff to continue to work under these conditions is a materially adverse action that would dissuade a reasonable worker from making or supporting a charge of retaliation.

187.    Retaliatory animus on the part of the Defendant is evidenced by temporal proximity between Plaintiff's ongoing protected activities and Defendant's discriminatory actions.

188.    Each of Defendant's unlawful acts alleged herein constitutes a separate and distinct act of retaliation; and in the aggregate and totality, amounted to an unlawful retaliatory hostile work environment perpetrated by Defendant and its agents.

189.    As a direct and proximate result of the unlawful retaliation by Defendant on the basis of Plaintiff's protected activities, Plaintiff has been deprived of economic and non-economic benefits, including, but not limited to, wages, mental pain and suffering, and disruption of her personal life.

190.    WHEREFORE, Plaintiff, Ms. Lynn Rebar, respectfully requests judgment in her favor and against Defendant and relief including, but not limited to, the following:

a.  Reimbursement for all costs, expenses, and financial loses Plaintiff has incurred as a result of the actions of Defendant;

b.  Reinstatement to a department in a position which accommodates Plaintiff's disabilities;

c.  Past, present, and future lost earnings, economic damages, and others;

d.  Compensatory damages;

e.  Reimbursement and make whole relief for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including, but not limited to, back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority;

f.  Punitive damages

g.  Reasonable attorney's fees and costs;

h.  Any and all other relief as the Court may deem appropriate.

## COUNT IV
### *PHRA- Gender Discrimination*

191.  The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

192.  Plaintiff is a female and, as such, is a member of a protected class under the PHRA.

193.  Defendant's actions, as described above, constitute unlawful discrimination against Plaintiff on the basis of her gender, in violation of the PHRA.

194.  Defendant mandated Plaintiff to work various shifts in Unit E, an all-women's unit. This post lacked a restroom, a significant issue Plaintiff raised by requesting reassignment, but her request was ignored. In contrast, the male units had direct access to restrooms within their units.

195.   Defendant failed to provide and/or maintain equal/equitable and/or equitably facilitated/located restroom facilities for its female employees as it did for its male employees.

196.   Plaintiff was also required to adhere to more onerous standards for restroom relief as compared to her male coworkers/colleagues.

197.   Moving all women from Unit E to Delta 6, a newly constructed building that similarly lacked restroom facilities, constituted a discriminatory act by the Defendant, targeting the Plaintiff based on her gender.

198.   Defendant had a consistent practice of denying Plaintiff restroom breaks. Furthermore, the Defendant ignored Plaintiff's inquiries regarding restroom accessibility specifically for women.

199.   An agent of the Defendant, AFA Bollinger, acknowledged during a ART training, that "women are the main contributors to contraband and sex with residents." He also acknowledged there was no restroom in the female unit.

200.   Defendant did not grant females access to the work computers, a problem only in the female unit.

201.   Defendant's unfair treatment to the female staff contributed to disparate treatment based on gender in violation of the PHRA.

202.  As a result of Defendant's denial of restroom relief and poor treatment, Plaintiff developed a urinary tract infection and was deterred from drinking water worried it may lead Plaintiff to require a restroom break.

203.  Plaintiff suffered significant, anxiety, stress, physical and emotional harm due to Defendant's actions and/or inaction.

204.  Defendant's discriminatory denial of accessible restroom facilities for female employees, which directly caused Plaintiff to suffer physical and emotional harm, constitutes a hostile work environment and disparate treatment based on gender in violation of the PHRA.

205.  As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has been deprived of economic and non-economic benefits, including, but not limited to, wages, mental and emotional distress, pain and suffering, and disruption of her personal life.

## COUNT V
### *PHRA- Sexual Harassment/Hostile Workplace*

206.  The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

207.  Plaintiff was subjected to unwelcome conduct of a sexual nature, including sexually suggestive comments by inmates, witnessing a male detainee masturbate, inappropriate touching and unwelcomed sexually suggestive verbal comments by supervisor Lt. Mignot, coworkers and detainees.

208.   Plaintiff was sexually assaulted by detainees.

209.   The conduct complained of was severe or pervasive enough to alter the conditions of Plaintiff's employment and created an objectively hostile, intimidating, and abusive work environment.

210.   The harassment was based on the Plaintiff's sex.

211.   Defendant knew or should have known of the severe and pervasive sexual harassment and hostile work environment but failed to take prompt and effective remedial action.

212.   Defendant is liable for the harassment caused and/or perpetrated by its agents under the theory of vicarious liability.

213.   Defendant is further liable for the harassment and assaults by detainees due to its deliberate indifference, failure to enforce its own zero tolerance policy, failure to take appropriate disciplinary action against detainees who sexually assaulted other staff members, thereby fostering a hostile environment and/or failure to take prompt remedial action.

214.   As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has been deprived of economic and non-economic benefits, including, but not limited to, wages, mental pain and suffering, and disruption of her personal life.

## COUNT VI
### *PHRA- Retaliation*

215.  The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

216.  Plaintiff engaged in protected activity under the PHRA, which included lodging complaints of pervasive sexual harassment in her work environment and raising concerns about not having access to adequate restroom facilities during her work shifts.

217.  Rather than taking remedial and/or corrective action to address Plaintiff's complaints of sexual harassment, Defendant subjected Plaintiff to various adverse employment actions, including but not limited to, Lt. Mignot's continued use of unwelcomed conduct and questioning detainees about Plaintiff's work ethic numerous times. Additionally, Defendant placed the detainee who sexually assaulted Plaintiff back on the same compound where Plaintiff worked, directly exposing Plaintiff to her assailants. Further, mandating Plaintiff to choose between being housed in an area or assigned to duties where she would be forced to work alongside two different detainees who had previously sexually harassed her.

218.  On a number of occasions, Plaintiff was denied relief to use the restroom by the Defendant. Consequently, Plaintiff would urinate on herself following the delay or denial to take a restroom break.

219.   Following Plaintiff's protected activity of complaining of these restroom conditions/disparity and sex-based complaints, Defendant would force Plaintiff to go home without pay after Plaintiff informed Lt. Mignot that she needed to use the restroom.

220.   In retaliation for her protected activity, Plaintiff also experienced other adverse actions from Defendant, such as her implication that Plaintiff was supplying contraband to detainees, unwarranted discipline, disparate treatment, routinely yelling at her, and threatening to write Plaintiff up.

221.   Defendant's unlawful act of requiring Plaintiff to continue to work under these conditions is a materially adverse action that would dissuade a reasonable worker from making or supporting a charge of retaliation.

222.   Retaliatory animus on the part of the Defendant is evidenced by temporal proximity between Plaintiff's ongoing protected activities and Defendant's discriminatory actions.

223.   Each of Defendant's unlawful acts alleged herein constitutes a separate and distinct act of retaliation; and in the aggregate and totality, amounted to an unlawful retaliatory hostile work environment perpetrated by Defendant and its agents.

As a direct and proximate result of the unlawful retaliation by Defendant on the basis of Plaintiff's protected activities, Plaintiff has been deprived of economic and

non-economic benefits, including, but not limited to, wages, mental pain and suffering, and disruption of her personal life.

WHEREFORE, Plaintiff requests the following:

    a.  that the Court enter a judgment declaring the Defendant's actions to be unlawful and violative of the PHRA;

    b.  that the Court award the Plaintiff liquidated damages in an amount equal to the pecuniary losses sustained as a result of the Defendant's willful violation of the PHRA;

    c.  that the Court award the Plaintiff compensatory damages as a result of Defendant's actions being unlawful and violative of the PHRA;

    d.  that the Court award the Plaintiff pre-judgment and post-judgment interest from the date of the discrimination;

    e.  that the Court award the Plaintiff reasonable attorneys' fees and costs of this action;

    f.  that the Court grant the Plaintiff such additional relief as may be just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands trial by jury.

**ABARA LAW FIRM, PLLC.**

s/Obinna I. Abara
Obinna I. Abara, Esq.
Attorney ID: 204964
3 Park Lane, #333
Douglassville, PA 19518
oabara@abaralaw.com
(215) 360-3260
Attorney for Plaintiff

**VERIFICATION**

I hereby verify that the statements contained in this **Complaint** are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of Title 18 Pa. C.S.A. §4904, relating to unsworn falsification to authorities.

Jul 7, 2025
_____
Date

*Lynn Rebar*
Lynn Ann Rebar (Jul 7, 2025 15:08 EDT)

LYNN REBAR, PLAINTIFF